FILED
2017 Jun-16 PM 01:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **KELVIN LARAY COOK,** | } |
| Plaintiff, | } |
| v. | } Case No.: 2:16-cv-1111-MHH |
| **NANCY A. BERRYHILL,**<br>**Acting Commissioner of the**<br>**Social Security Administration,** | } |
| Defendant. | } |

# MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Kelvin Laray Cook seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Mr. Cook's claims for a period of disability, disability insurance benefits, and supplemental security income. After careful review, the Court affirms the Commissioner's decision.[1]

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. (*See* https://www.ssa.gov/agency/commissioner.html). Therefore, the Court asks the Clerk to please substitute Ms. Berryhill for Carolyn W. Colvin as the defendant in this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later opinions should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

## I. PROCEDURAL HISTORY

Mr. Cook applied for a period of disability and disability insurance benefits and supplemental security income on December 10, 2012. (Doc. 7-6, pp. 2, 9). Mr. Cook alleges that his disability began December 1, 2012. (Doc. 7-6, pp. 2, 9). The Commissioner initially denied Mr. Cook's claims on June 6, 2013. (Doc. 7-5, p. 2). Mr. Cook requested a hearing before an Administrative Law Judge (ALJ). (Doc. 7-5, pp. 9-10). The ALJ issued an unfavorable decision on September 9, 2014. (Doc. 7-3, p. 13). On May 5, 2016, the Appeals Council declined Mr. Cook's request for review (Doc. 7-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. §§ 405(g) and 1383(c).

## II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as

adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III.  SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of

3

Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Mr. Cook has not engaged in substantial gainful activity since December 1, 2012, the alleged onset date. (Doc. 7-3, p. 18). The ALJ determined that Mr. Cook suffers from the following severe impairments: congestive heart failure, non-ischemic cardiomyopathy, and obesity. (Doc. 7-3, p. 18). The ALJ determined Mr. Cook has non-severe medically determinable physical impairments such as sleep apnea and hypertension. (Doc. 7-3, pp. 18-19). Based on objective medical evidence, the ALJ also found that Mr. Cook has no residual limitations from a previous stroke. (Doc. 7-3, p. 19). Based on a review of the medical evidence, the ALJ concluded that Mr. Cook does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 19).

In light of Mr. Cook's impairments, the ALJ evaluated Mr. Cook's residual functional capacity. The ALJ determined that Mr. Cook has the RFC to perform

> . . . sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is able to occasionally balance, stoop, kneel, crouch, crawl[,] and climb ramps and stairs but never ladders, ropes,

or scaffolds; is able to work in an environment that does not require concentrated exposure to fumes, odors, gases, and poor ventilation; is able to perform tasks that do not involve work with hazardous machinery or unprotected heights; must be allowed to alternate between standing and sitting every 1-2 hours as needed; or must be allowed to stand and stretch for 1-2 minutes at the work station as needed every 1-2 hours while remaining on task; must be allowed to elevate his bilateral lower extremities on a foot stool when seated; is able to perform tasks that do not require stringent production or fast pace; will be off task 10% of the day and miss 1-2 days of work per month.

(Doc. 7-3, p. 20). Based on this RFC, the ALJ concluded that Mr. Cook is not able to perform his past relevant work as a technician, mechanic, or an auto mechanic supervisor. (Doc. 7-3, p. 23). Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Mr. Cook can perform, including document preparer, sealer, and order clerk. (Doc. 7-3, p. 24). Accordingly, the ALJ determined that Mr. Cook has not been under a disability within the meaning of the Social Security Act. (Doc. 7-3, p. 25).

## IV. ANALYSIS

Mr. Cook argues that he is entitled to relief from the ALJ's decision because the ALJ erred in finding that Mr. Cook does not meet Listing 4.02 and because the ALJ did not properly weigh the opinion of Mr. Cook's treating cardiologist, Dr. Harish Doppalapudi. The Court examines each issue in turn.

**A. Substantial evidence supports the ALJ's finding that Mr. Cook does not meet Listing 4.02.**

Mr. Cook argues the ALJ erred at Step Three by failing to find that Mr. Cook meets Listing 4.02 for chronic heart failure. (Doc. 9, p. 7; Doc. 11, p. 7).[2] The Listings describe impairments that are "severe enough to prevent an individual from doing any gainful activity, regardless of his [] age, education, or work experience." 20 C.F.R. § 404.1525(a). A claimant satisfies his burden of establishing a disability by showing that his impairment meets one of the listings. 20 C.F.R. § 404.1520(d).

> [T]o meet a Listing, the claimant must (1) have a diagnosed condition included in the Listing, and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable Listing and the duration requirement. A diagnosis alone is insufficient.

*Wilkinson o/b/o/ Wilkinson v. Bowen*, 847 F.2d 660, 663 (11th Cir. 1987) (emphasis omitted). In addition, a claimant's impairment must meet all of the specified medical criteria for the claimant to show that his impairment matches a listing. An impairment that meets some but not all of the criteria does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

To meet Listing 4.02, a claimant must have:

A. Medically documented presence of the following:

1. Systolic failure (see 4.00D1a(1)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

---

[2] Mr. Cook filed two briefs. (Doc. 9; Doc. 11). The documents are identical.

2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

   AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

   a. Dyspnea, fatigue, palpitations, or chest discomfort; or

   b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

   c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

> d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. pt. 404, Subpt. P, app. 1, § 4.02 (emphasis in Listing).[3]

Mr. Cook challenges the ALJ's findings with respect to Listing 4.02(A)(1) and (B)(1). (Doc. 9, pp. 7-8; Doc. 11, pp. 7-8). With respect to Listing 4.02(A)(1), the ALJ concluded that "[t]he medical evidence does not reflect medically documented presence of either systolic failure, with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability." (Doc. 7-3, p. 19). Contrary to the ALJ's finding, an echocardiogram from March 2013 showed an ejection fraction of 15-20% during a period of stability. (Doc. 7-9, pp. 7-11).[4] Therefore, the ALJ erred in finding that Mr. Cook does not meet the requirements of Listing 4.02(A)(1); however, the error is harmless because, as discussed below, substantial evidence supports the ALJ's finding that Mr. Cook does not meet Listing 4.02(B).

Concerning the "B" criteria of Listing 4.02, the ALJ explained that:

---

[3] According to 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00(C)(3)(a), an "MC" is a medical consultant. A medical consultant is "a member of a team that makes disability determinations in a State agency (see § 416.1015), or who is a member of a team that makes disability determinations for us when we make disability determinations ourselves." 20 C.F.R. § 416.1016(a).

[4] A November, 27, 2012 echocardiogram shows an ejection fraction of 10-15%; however, that echocardiogram does not fit the category of the Listing because it was taken during a time when Mr. Cook was admitted into the hospital for acute heart failure and not during a period of stability. (Doc. 7-3, p. 21; Doc. 7-8, p. 8).

8

> [t]he medical evidence does not reflect persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living; 3 or more separate episodes of acute congestive heart failure within a consecutive 12-month period; or inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less.

(Doc. 7-3, p. 19).

Citing a medical source statement and a physical capacities evaluation that Dr. Doppalapudi completed on his behalf, Mr. Cook maintains that he "is seriously limited in his ability to independently sustain activities of daily living," and therefore, the ALJ erred in finding that Mr. Cook does not meet Listing 4.02(B)(1). (Doc. 9, p. 7; Doc. 11, p. 7; *see also* Doc. 7-9, pp. 82, 84-85).[5] The Court disagrees because the limitations that Dr. Doppalapudi identified are inconsistent with the medical evidence as a whole, and the ALJ articulated good cause for rejecting Dr. Doppalapudi's opinion.

In November 2012, Mr. Cook experienced chest pain and inability to speak. (Doc. 7-8, pp. 8-9). He was hospitalized from November 25, 2012 through December 11, 2012 and diagnosed with acute heart failure, nonischemic dilated cardiomyopathy with severe biventricular dysfunction, multiple acute and subacute ischemic cerebral infarcts, left ventricular thrombi, moderate to severe MR, moderate TR, and sleep apnea. (Doc. 7-3, p. 21; Doc. 7-8, p. 8). A stroke protocol

---

[5] Mr. Cook does not argue, and the record does not contain evidence suggesting, that he meets the requirements of Listing 4.02(B)(2) or 4.02(B)(3). Therefore, the Court discusses only Mr. Cook's argument concerning Listing 4.02(B)(1) and the ALJ's corresponding findings.

performed on November 26, 2012 revealed an acute infarct of the left frontal lobe, bilateral parietal lobes and bilateral cerebellum. (Doc. 7-3, p. 21; Doc. 7-8, p. 8). A November 27, 2012 echocardiogram revealed a severely dilated left ventricle with multiple left ventricular thrombi, a left ventricular ejection fraction 10-15%, severely reduced right ventricular systolic function, mild to severe mitral regurgitation, and moderate tricuspid regurgitation. (Doc. 7-8, p. 8). Mr. Cook was treated with Coummadin, a beta blocker, and Lasix, and was discharged "in good condition" with a life vest for arrhythmia. (Doc. 7-8, pp. 10-11). At discharge, doctors placed "no restrictions on [Mr. Cook's] activity." (Doc. 7-8, p. 11).

On February 13, 2013, Mr. Cook saw Dr. Shirin Banu at Cooper Green Hospital. (Doc. 7-8, pp. 79-81). Mr. Cook denied chest pain or discomfort, and he had no palpitations or orthopnea. (Doc. 7-8, p. 80). Mr. Cook had a normal cardiac and respiratory examination. (Doc. 7-8, p. 80). Dr. Banu noted that Mr. Cook was stable on Lasix and had no residual damage from his stroke. (Doc. 7-8, p. 81).

On March 26, 2013, Mr. Cook saw Dr. Doppalapudi for a consultation following his hospitalization. (Doc. 7-9, p. 7). Mr. Cook told Dr. Doppalapudi that he (Mr. Cook) was feeling "much better." (Doc. 7-9, p. 7). Mr. Cook had no shortness of breath, chest pain, or lightheadedness, and his exercise capacity was

back to baseline. (Doc.7-9, p. 7). Mr. Cook could jog almost a block without tiring, and his symptoms had improved with therapy. (Doc. 7-9, pp. 7, 9). He had no shocks to his lifevest. (Doc. 7-9, p. 7). A cardiovascular exam revealed "[n]ormal rate, [r]egular rhythm, [n]o murmur, [n]o gallop, [and n]o edema." (Doc. 7-9, p. 9). An echocardiogram revealed a left ventricle ejection fraction of 15-20% with severe dilation. (Doc. 7-9, p. 11).

On May 13, 2013, non-examining state agency consultant Dr. Samuel Chastain reviewed Mr. Cook's medical records and opined that Mr. Cook can occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; stand and/or walk 4 hours; and sit about 6 hours in an 8-hour work day. (Doc. 7-4, p. 6). Dr. Chastain also found that Mr. Cook is able to occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, crawl; is able to work in an environment that does not require concentrated exposure to fumes, odors, dusts, gases and poor ventilation; and is able to perform tasks that do not involve work with hazardous machinery or unprotected heights. (Doc. 7-4, pp. 6-7).

On June 28, 2013, Mr. Cook visited Dr. Doppalapudi to have a pacemaker (ICD) implanted. (Doc. 7-9, pp. 70, 74). Before the procedure, Mr. Cook told Dr. Doppalapudi that he had no shortness of breath or chest pain, that he slept on one pillow, and that he had no problems exercising. (Doc. 7-9, p. 74). Mr. Cook had

received no shocks from his lifevest. (Doc. 7-9, p. 70). A cardiovascular exam was normal, and Dr. Doppalapudi described Mr. Cook's living situation as "independent." (Doc. 7-9, pp. 71, 72).

In August 2013, Mr. Cook saw Dr. Banu for a follow-up visit. (Doc. 7-9, p. 30). Mr. Cook reported no chest pain or shortness of breath, no palpitations or orthopnea, and a heart exam was normal. (Doc. 7-9, p. 31). Dr. Banu described Mr. Cook's congestive heart failure as "stable." (Doc. 7-9, p. 32).

In October 2013, Mr. Cook saw Dr. Doppalapudi to follow-up on the pacemaker placement. (Doc. 7-9, pp. 62-63). Mr. Cook reported no episodes of ventricular arrhythmia requiring ICD therapy. (Doc. 7-9, p. 63). His congestive heart failure remained stable. (Doc. 7-9, p. 63). Mr. Cook had a normal cardiac exam, and Dr. Doppalapudi stated Mr. Cook was doing well since his hospitalization. (Doc. 7-9, p. 63). Dr. Doppalapudi asked Mr. Cook to return in six months. (Doc. 7-9, p. 64).

On January 7, 2014, Mr. Cook reported to Dr. Banu that he previously experienced shortness of breath that was resolved with Lasix. (Doc. 7-10, p. 54). During the visit, Mr. Cook denied chest pain and shortness of breath. (Doc. 7-10, p. 54). A cardiac exam was normal, Dr. Banu stated that Mr. Cook's congestive heart failure was stable, and Dr. Banu continued Mr. Cook on his treatment regimen. (Doc. 7-10, pp. 55-56).

On January 16, 2014, Dr. Doppalapudi completed a physical capacities evaluation and medical source statement on behalf of Mr. Cook. (Doc. 7-9, pp. 82, 84-85). In the medical statement, Dr. Doppalapudi stated that Mr. Cook's dilated congestive cardiomyopathy causes fatigue on exertion, mural thrombus, decreased left ventricular ejection fraction shown by appropriate imaging techniques, and palpitations. (Doc. 7-9, p. 84). Dr. Doppalapudi opined that Mr. Cook was limited to standing for 15 minutes at a time, sitting for 60 minutes at a time, working for 2 hours a day, and lifting 10 pounds on either an occasional or frequent basis. (Doc. 7-9, p. 84). Dr. Doppalapudi also explained that Mr. Cook must elevate his legs frequently during the workday. (Doc. 7-9, p. 84).

In the physical capacities evaluation, Dr. Doppalapudi opined that Mr. Cook can occasionally lift 10 pounds and frequently lift 5 pounds; sit for 2 hours out of an 8-hour work day and stand or walk for 1 hour out of an 8-hour work day; lift or carry ten pounds occasionally and five pounds frequently; rarely (1%-5% of an 8-hour work day) use push and pull movements; climb stairs and ladders and balance, bend or stoop, or operate motor vehicles; occasionally (6%-33% of an 8-hour work day) use gross manipulation, fine manipulation, reach, and work around environmental problems like allergies and dust; and never work with or around hazardous machinery. (Doc. 7-9, p. 82). Dr. Doppalapudi also stated that Mr.

Cook is likely to miss more than 4 days of work per month due to his limitations. (Doc. 7-9, p. 82).

Mr. Cook had no complaints when he visited Dr. Banu on April 29, 2014. (Doc. 7-10, p. 47). Mr. Cook rated his pain at 0 on a scale from 1-10. (Doc. 7-10, p. 48). He had a normal examination, and Dr. Banu explained that Mr. Cook's congestive heart failure was "stable." (Doc. 7-10, pp. 48-49). On May 22, 2014, during a "routine follow-up," Mr. Cook reported that he was "doing well" since his last visit and that he could walk many blocks before getting short of breath. (Doc. 7-10, pp. 45-46).

In July 2014, when Mr. Cook saw Dr. Doppalapudi, Mr. Cook was doing well, and he had a normal cardiovascular examination with no edema, no ventricular arrhythmia requiring ICD therapy, and no significant RV pacing. (Doc. 7-10, pp. 35-36).

The limitations that Dr. Doppalapudi identified in his January 2014 medical source statement and physical capacities evaluation are the only examples of medical evidence in the record that support Mr. Cook's contention that he meets Listing 4.02(B)(1). Dr. Doppalapudi's opinion, however, is inconsistent with Mr. Cook's treatment for his congestive heart failure. After his initial hospitalization for acute heart failure, Mr. Cook routinely had benign cardiac examinations; he rarely reported chest pain or shortness of breath; doctors regularly found that Mr.

Cook's congestive heart failure was stable; and Mr. Cook's physicians did not limit his activity at any point during their treatment. In addition, in a function report that Mr. Cook completed in February 2013, he explained that despite having trouble lifting, he does laundry and ironing; he walks outside every day; he cares for his pets; he attends church and sporting events on a regular basis; he shops for food and personal items; and he walks one mile without needing to stop and rest. (Doc. 7-7, pp. 13-17). Accordingly, substantial evidence supports the ALJ's determination that Mr. Cook does not meet Listing 4.02(B)(1). *See Crawford*, 363 F.3d at 1158 (11th Cir. 2004) (substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion") (internal quotation marks and citation omitted).

The Court is not persuaded by Mr. Cook's argument that the ALJ should have required a medical expert to testify regarding whether Mr. Cook's condition medically equals Listing 4.02 pursuant to SSR 96-6p. (Doc. 9, p. 8; Doc. 11, p. 8). According to SSR 96-6p, "an [ALJ] and the Appeals Council must obtain an updated medical opinion from a medical expert . . . [w]hen additional medical evidence is received that in the opinion of the [ALJ] may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p, 1996 WL 374180 at *1, 3-4 (July 2, 1996). The ALJ was not required to

obtain an updated medical expert opinion simply because Mr. Cook submitted additional medical evidence after Dr. Chastain, the state agency consultant, provided his medical opinion. Although Dr. Doppalapudi's January 2014 medical source statement and physical capacities evaluation contradicts Dr. Chastain's opinion, as explained above, the medical evidence as a whole supports the ALJ's findings with respect to Listing 4.02(B)(1). The ALJ's decision reflects that he examined the evidence that post-dates Dr. Chastain's opinion and that the new evidence would not have changed Dr. Chastain's opinion. *See Carpenter v. Comm'r of Soc. Sec.*, 614 Fed. Appx. 482, 488 (11th Cir. 2015).

### B. The ALJ properly considered the opinion of Mr. Cook's treating physician.

An ALJ must give the opinion of a treating physician like Dr. Doppalapudi "substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (citations omitted). Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1240-41*; see also Crawford*, 363 F.3d at 1159 (noting a treating physician's report may be discounted if it is wholly conclusory or not supported by objective medical evidence); *Edwards v. Sullivan*, 937 F. 2d 580, 583-84 (11th Cir. 1991) (good cause exists when facts in the physician's own

record contradict the opinion). "The ALJ must clearly articulate the reasons for giving less weight to a treating physician's opinion, and the failure to do so constitutes error." *Gaskin*, 533 Fed. Appx. 929, 931 (11th Cir. 2013) (citing *Lewis v. Callahan*, 125 F. 2d 1436, 1440 (11th Cir. 1997)).

As discussed above, *see* pp. 13-14, *supra*, Dr. Doppalapudi completed a physical capacities evaluation and a medical source statement on January 16, 2014. (Doc. 7-9, p. 82, 84-85). The ALJ assigned little weight to Dr. Doppalapudi's January 2014 opinions. (Doc. 7-3, p. 23). The ALJ explained that Dr. Doppalapudi's opinion:

> is not consistent with the longitudinal objective medical evidence or with the claimant's subjective representations. The claimant admitted he could sit for 2 hours at a time, but Dr. Doppalapudi limited him to sitting for 1 hour at a time. Additionally, the record contains no support for any handling or fingering limitations.

(Doc. 7-3, p. 23).

The ALJ articulated good cause for giving little weight to Dr. Doppalapudi's January 2014 opinions. First, the record contains no objective medical evidence to bolster Dr. Doppalapudi's postural limitations. Second, as discussed above, *see* pp. 9-15, *supra*, Dr. Doppalapudi's opinion is inconsistent with the longitudinal medical evidence. Third, Dr. Doppalapudi's opinion that Mr. Cook can sit for only one hour at a time is inconsistent with Mr. Cook's testimony during his hearing

17

that he can sit for two hours at a time. (Doc. 7-3, p. 43).[6] Finally, many of Dr. Doppalapudi's own records are inconsistent with his January 2014 opinions. Therefore, substantial evidence supports the ALJ's decision to give the opinion little weight. *See Crawford*, 363 F.3d at 1159 (treating physician's opinion that the claimant was totally and permanently disabled was unsupported by the medical evidence and inconsistent with the physician's own treatment notes); *see also Roth v. Astrue*, 249 Fed. Appx. 167, 168 (11th Cir. 2007) (substantial evidence supported the ALJ's determination that the treating physician's opinion "should not be assigned substantial weight because it was inconsistent with the record as a whole and not supported by the doctor's own medical records").

Mr. Cook argues that Dr. Doppalapudi's diagnoses of congestive heart failure and NICM with severe biventricular dysfunction, as well as treatments of anticoagulation therapy and the placement of a pacemaker support Dr. Doppalapudi's opinion regarding Mr. Cook's limitations. (Doc. 9, pp. 11-12; Doc. 11, pp. 11-12). However, diagnoses alone do not indicate limitations on a claimant's ability to work. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n. 6 (11th Cir. 2005) ("[T]he mere existence of [] impairments does not reveal the extent to which they limit [a claimant's] ability to work. . . ."); *see also Osborn v. Barnhart*,

---

[6] While Mr. Cook argues there is no contradiction, a plain reading of the physical capacities evaluation and the medical statement reveals that Dr. Doppalapudi opined that Mr. Cook can sit for two hours during an 8-hour workday, but Mr. Cook is limited to sitting for one hour at a time. (Doc. 7-9, pp. 82, 84).

18

194 Fed. Appx. 654, 667 (11th Cir. 2006) (diagnosis alone does not indicate limitations on claimant's ability to work which is "a requisite to a finding of disability"). The ALJ properly reviewed the medical evidence concerning Mr. Cook's diagnosed impairments and concluded that Dr. Doppalapudi's opinion regarding Mr. Cook's limitations as a result of those impairments was inconsistent with the medical evidence as a whole.

## V. CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this June 16, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE